1   BRYAN SCHWARTZ LAW, P.C.
    Bryan Schwartz (SBN 209903)
2   Erica Posey (SBN 356109)
    180 Grand Avenue, Suite 1380
3   Oakland, CA 94612
    Tel. (510) 444-9300
4   Fax (510) 444-9301
    Email: bryan@bryanschwartzlaw.com
5           erica@bryanschwartzlaw.com
6
7   *Attorneys for Plaintiff*
8
9               IN THE UNITED STATES DISTRICT COURT
10             FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
12
13  JOHN DOE, an individual              Case No. _____
14          Plaintiff,                   **COMPLAINT FOR DAMAGES**
15          v.                           1. **ASSOCIATIONAL DISABILITY**
                                            **DISCRIMINATION IN VIOLATION**
16  CHEVRON GLOBAL TECHNOLOGY               **OF THE ADA**
    SERVICES CO. and CHEVRON            2. **RETALIATION IN VIOLATION OF**
17  CORPORATION,                           **THE ADA**
                                         3. **ASSOCIATIONAL DISABILITY**
18          Defendants.                    **DISCRIMINATION IN VIOLATION**
                                            **OF THE FEHA**
19                                       4. **RETALIATION IN VIOLATION OF**
                                            **THE FEHA**
20                                       5. **FAILURE TO PREVENT**
                                            **DISCRIMINATION AND**
21                                          **RETALIATION IN VIOLATION OF**
                                            **THE FEHA**
22                                       6. **WHISTLEBLOWER RETALIATION**
                                            **IN VIOLATION OF THE**
23                                          **CALIFORNIA LABOR CODE**
24
                                         **DEMAND FOR JURY TRIAL**
25
26
27
28

Plaintiff John Doe ("Plaintiff" or "Doe") complains and alleges against Defendant Chevron Corporation ("Defendant") as follows:

## INTRODUCTION

1.    Plaintiff brings associational disability and retaliation claims against his former employers, Chevron Global Technology Services Co. ("Chevron GlobTech") and Chevron Corporation.

2.    Plaintiff is an experienced attorney who had a distinguished career at Chevron for more than a decade before being forced out after Chevron denied him equal jobs and benefits of employment because of his association with a family member with disabilities. Plaintiff spoke out about this discrimination, which he perceived to impact not only himself but other Chevron employees, and was retaliated against for standing against it. His advocacy provoked reprisal from his supervisors and higher-level corporate officials, and effectively ended his successful and lucrative career at Chevron.

3.    Plaintiff brings this action based on the Americans With Disabilities Act ("ADA"), the California Fair Employment and Housing Act ("FEHA"), and the California Labor Code.

## THE PARTIES

4.    Plaintiff is an adult man, a U.S. citizen, and is presently a resident of the State of Washington.

5.    Defendant Chevron GlobTech is a Delaware corporation. At all relevant times, Chevron Globtech maintained its headquarters and principal place of business at 6001 Bollinger Canyon Road, San Ramon, California, 94583. Chevron GlobTech is a wholly owned subsidiary of Defendant Chevron Corporation, a Delaware corporation with its headquarters and principal place of business at the same address as Chevron GlobTech: 6001 Bollinger Canyon Road, San Ramon, California, 94583 at all relevant times. Chevron GlobTech and Chevron Corporation each have more than 20 employees and are collectively referred to herein as "Chevron." In August 2024, after the events at issue in this case, Chevron moved their corporate headquarters to 1400 Smith St., Houston, TX 77002.

COMPLAINT AND JURY DEMAND

**JURISDICTION AND VENUE**

6.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff brings this action based on federal questions under the Americans with Disabilities Act.

7.    Venue is proper in this District under 28 U.S.C. § 1391 because Chevron resided in, transacted business in, or had offices in this District at all times when the incidents that are the subject of this case were occurring, and a substantial part of the acts and omissions alleged herein took place in this District.

**FACTUAL BACKGROUND**

8.    Plaintiff began working for Chevron in 2012 as a Senior Counsel – Global Disputes and Investigations. He joined the company following more than a decade at a large, California-based international law firm.

9.    For several years, Plaintiff managed the company's international litigation portfolio, garnering praise for his competence. He worked out of Chevron's then-headquarters in San Ramon, California, from approximately 2012 to 2020.

10.    Many of Chevron's highest-ranking officials have served in international posts for the company, and Plaintiff is informed and believes that a foreign assignment is a career accelerator for those interested in advancing at Chevron. Foreign assignments are typically compensated at much higher rates than comparable domestic roles, and many employees selected for foreign assignment complete two or more foreign assignments back-to-back.

11.    In around October 2019, Plaintiff was approached by the Chevron Chief Compliance Officer regarding his interest in taking a role that would be newly created to manage the compliance function within Chevron's largest joint venture, TCO.  On information and belief, the role was considered high-profile and was created at the request of the Chevron Board of Directors.

12.    In 2020, Plaintiff achieved what many Chevron employees seek – a foreign assignment. Plaintiff was assigned to become the Head of Ethics, Compliance and Internal Investigations, leading the roughly 20-person team of compliance and investigations personnel at Chevron's joint venture, Tengizchevroil LLP ("TCO"), in Atyrau, Kazakhstan.

13.     Before beginning the assignment, Chevron's Chief Compliance Officer told Plaintiff that if he succeeded in that role, he could "write his own ticket" at Chevron.

14.  TCO was formed in 1993 as a joint venture between the Kazakhstani state oil company, KazMunaiGas, and Chevron, and its current partners are Chevron (50%), ExxonMobil (25%), KazMunaiGas (20%), and Lukoil (5%).

15.     Under the Formation Agreement and related contracts establishing and governing TCO, and in practice, Chevron has a dominant role in the management of TCO.

16.     TCO is crucial to Chevron's business, with its net income equaling  32.7% of Chevron's total net income for 2024, according to Chevron's most recent 10-K. Chevron owns a 50% stake in TCO and, on information and belief, has managed key TCO functions remotely through personnel in the U.S., in the San Ramon headquarters, and elsewhere, including key compliance, finance, legal, and sales functions.

17.     Chevron appoints its own employees to leadership and other roles at TCO, including the lead role (General Director) and the heads of Operations, Marketing and Transportation, Finance, Health, Safety and Environment.

18.     For those departments at TCO where Chevron does not appoint the lead roles, it appoints deputies to ensure Chevron's interests are addressed; those include Legal, Human Resources, Strategic Planning, and Public and Government Affairs.

19.     Chevron has implemented numerous policies related to resident expatriate assignments, including a requirement that the families of its employees live for a majority of each year in the host country. In Kazakhstan, Chevron also required that employees with school-age children enroll in the Dostyk American International School ("DAIS"), which was located within a compound where resident Chevron employees live. Following the events at issue in this case, Chevron announced that the DAIS school would be closing in June 2025.

20.     DAIS is operated by a third party, International School Services Kazakhstan ("ISS"), and only children of resident Chevron employees were eligible to attend.

21.     The DAIS school was solely owned by Chevron.

22.    The contract with International Schools Services Kazakhstan is managed by Chevron's Deputy Manager for Human Resources in Atyrau, Kazakhstan, with support from Chevron Human Resources personnel in the United States. Enrollment for dependent children at the DAIS school was considered a "benefit of employment" under the ADA.

23.    Plaintiff's oldest child, D.P., has been diagnosed with Autism Spectrum Disorder ("ASD"), with no language or intellectual impairments.

24.    Plaintiff disclosed this diagnosis to Chevron's third-party medical evaluation vendor in Danville, California, in April 2020 as part of the standard pre-assignment medical assessment process required under Chevron's Resident Expatriate Policy.

25.    Prior to the assignment in Kazakhstan, Plaintiff worked for Chevron primarily in the San Francisco Bay Area since he was hired in 2012. Plaintiff mobilized from Chevron's San Ramon, California headquarters to Kazakhstan on October 13, 2020, but due to travel restrictions during the pandemic, his family could not accompany him immediately. Plaintiff's family remained in the San Francisco Bay Area in California for approximately ten months after Plaintiff began his assignment in Kazakhstan.

26.    In November 2020, Plaintiff applied to DAIS for all three children in anticipation of their eventual arrival and disclosed D.P.'s diagnosis to DAIS in the process.

27.    Roughly one week later, Plaintiff was contacted by Chevron Human Resources manager, Tracy Rattray, and informed that she had recently learned from DAIS that one of Plaintiff's children had a disability. Ms. Rattray stated that had Chevron HR known about D.P.'s diagnosis before Plaintiff arrived in Kazakhstan, Plaintiff would not have been eligible to take the international assignment.

28.    Ms. Rattray indicated that she would need to consult with Eimear Bonner – a Chevron employee and the then-General Director of TCO – on how to handle Plaintiff's circumstance since he had already mobilized to Kazakhstan.  Ms. Bonner has since been promoted to Chevron's Chief Financial Officer.

29.    Chevron HR also instructed Plaintiff not to communicate with DAIS and indicated

- 4 -
COMPLAINT AND JURY DEMAND

1    that any decisions on schooling arrangements would be communicated from Chevron HR.

2        30.     In March of 2021, Plaintiff sought additional clarifications on Chevron policy with

3    respect to schooling for children of resident Chevron expatriates by reaching out to Chevron HR

4    manager, Yvonne McIntyre, and the Managing Counsel for Employment Law, Abiel Wong, based in

5    San Ramon, California. In addition to raising concerns that Chevron's schooling policies disparately

6    impacted employment opportunities for parents of special needs children, Plaintiff also sought

7    clarification on policies around homeschooling as an alternative if his D.P. could not be enrolled at

8    DAIS.

9        31.     On March 22, 2021, Ms. McIntyre responded that Chevron's goal in expatriate

10   management was to minimize distractions for their employees. She attached a fact sheet of Location

11   Specific Information for employees assigned to Atyrau, Kazakhstan, updated as of December 2020,

12   which flatly stated that homeschooling was not permitted in Atyrau.

13       32.     Plaintiff followed up on March 23, 2021, noting that the same policy document

14   issued in January 2020 indicated that although homeschooling was not a preferred option, it could be

15   requested and approved through local HR. The document appeared to have been amended to entirely

16   prohibit homeschooling within a month of his protected disclosure of his child's condition. He also

17   clarified that he was concerned about the discriminatory effect the policy would have against

18   employees with special needs children by denying possible alternatives to schooling at DAIS for

19   Chevron employees sent to work at TCO.

20       33.     Ultimately, the Plaintiff was advised that the family would be permitted to

21   homeschool D.P. for the 2021-2022 school year, subject to review one year after the mobilization of

22   Plaintiff's family to Atyrau. Per Ms. McIntyre, the decision to agree to this "exception" from the

23   homeschooling policy was made because Plaintiff had already begun his assignment in country.

24       34.     At Chevron's direction, D.P. also underwent a psychological assessment in March

25   2021 at his home in San Ramon, California prior to mobilization.  The assessment was coordinated

26   by a Chevron Employee Assistance Representative and a Chevron Occupational Health physician,

27   both in California, and conducted by a licensed psychologist and faculty member at the U.C.

28

1    Berkeley School of Education.

2        35.    Immediately after Plaintiff's wife and children mobilized to Atyrau in summer 2021,

3    Plaintiff's wife reached out to the Director of DAIS, Susan Ballantyne, and sought additional

4    clarification about what information would be required to evaluate D.P.'s suitability to attend the

5    school. Director Ballantyne informed Plaintiff's wife that Chevron H.R. Manager Tracy Rattray

6    required all questions regarding D.P.'s schooling to be routed through Chevron.

7        36.    Ms. Rattray followed up with Plaintiff on August 11, 2021, to state that the exception

8    to the homeschooling policy was granted with the understanding that schooling would be solely

9    managed by Plaintiff's family without support from TCO, and to state that DAIS was not resourced

10   to support special needs. Plaintiff sought permission from Ms. Rattray, copying Ms. McIntyre, to

11   share the  report from the psychologist Chevron contracted directly with DAIS personnel to re-

12   evaluate whether the school had adequate resources to support him. On August 16, 2021, in a five-

13   sentence email, Ms. McIntyre responded that "DAIS is not equipped to handle matriculation for

14   [D.P.]" and that Plaintiff's inquiry further into the possibility of D.P.'s enrollment was greatly

15   concerning. Ms. McIntyre rejection of Plaintiff's request that his child be considered for enrollment

16   at DAIS was issued even though Ms. McIntyre should not, due to medical confidentiality, have had

17   access to the educational assessment that Chevron required.  Nor had Ms. McIntyre allowed it to be

18   shared with DAIS.

19       37.    On that same day, August 16, 2021, Plaintiff requested to escalate the issue into

20   Chevron's formal dispute resolution process, Steps to Employee Problem Solving ("STEPS"), in an

21   email to David Carsey, then Deputy General Manager, Legal for TCO. In his email, Plaintiff

22   reiterated that he was seeking an opportunity to engage directly with school officials, to provide them

23   with the Chevron-requested psychological report, and to have the Director of the school make the

24   final decision as to suitability, as provided in the DAIS admissions policy.

25       38.    After Plaintiff received permission to share the latest psychological assessment with

26   DAIS directly, D.P.'s enrollment was nonetheless denied, ostensibly based upon Covid-19 protocols

27   and the inexperience of classroom teachers, with an offer to reconsider in the future if circumstances

28

1  changed.

2      39.    In the subsequent academic year (2022-2023), Plaintiff again asked to receive the

3  same benefit of employment that other employees with non-disabled children received, namely,

4  schooling for D.P. at DAIS. The conditions that led to the denial of D.P.'s enrollment in the prior

5  year — concerns that D.P. may not comply with strict mask-wearing protocols in place previously,

6  and about the relative inexperience of the teachers — had changed.

7      40.    At the request of Chevron Medical, Plaintiff undertook an updated

8  neuropsychological and educational assessments of D.P. conducted in May of 2022.  As with the

9  prior year, Plaintiff sought permission to share the report with DAIS and this time was allowed to do

10  so. In granting that permission, Chevron Human Resources Manager, Bridget Sumter McDaniel,

11  indicated that she would be part of D.P.'s admissions decision, and would offer the "Expatriate

12  Policy perspective."

13      41.    On August 21, 2022, Director Ballantyne, after reviewing the assessments, concluded

14  that the recommendations did not appear to require any specialized staff or supports beyond what all

15  students received at the school.

16      42.    On August 22, 2022, Director Ballantyne met with the Plaintiff and his wife to

17  discuss the most recent assessments and next steps to determine D.P.'s eligibility to enroll at DAIS.

18  The Plaintiff and his wife left the August 22, 2022 meeting with the understanding that Director

19  Ballantyne would recommend to Chevron that D.P. be admitted to DAIS for the 2022-23 school

20  year.

21      43.    On September 22, 2022, Chevron rejected the school's endorsement. A Deputy HR

22  General Manager for Chevron, Bridget Sumter McDaniel, communicated the denial of admissions to

23  Plaintiff. Ms. Sumter McDaniel said the decision was based on Chevron's policy against admitting

24  special-needs children at the school and that there was no precedent for an exception.

25      44.    When Plaintiff asked under what circumstances D.P. would be allowed to enroll, Ms.

26  Sumter McDaniel said D.P. would never be allowed to enroll.

27      45.    Plaintiff took immediate steps to appeal Chevron's decision. He reached out to his

28

COMPLAINT AND JURY DEMAND

supervisor, James Voyles, on September 23, 2022, to communicate that he was invoking an internal

Chevron process (Policy 224, "STEPS") to escalate his concern that he was being denied a benefit of

employment.

46.     In late September 2022, Plaintiff also spoke with the Chevron Chief Compliance

Officer, David Cohen, who was based in San Ramon, California, to relay that Chevron HR had

decided not to allow D.P. to enroll.

47.     In a series of discussions involving Plaintiff, Ms. Sumter McDaniel, Mr. Voyles, and

Dr. Scott Levy, a Chevron medical doctor, between September 22 and 29, 2022, Ms. Sumter

McDaniel maintained her position that admitting D.P. would be against policy and precedent.

48.     In one such meeting attended by Mr. Voyles and Dr. Levy on September 29, 2022,

Plaintiff proposed a compromise – that D.P. be allowed to attend on a trial basis, a proposal Dr. Levy

supported.

49.     Ms. Sumter McDaniel rejected the proposal at that meeting on September 29, 2022,

citing again Chevron's bright-line policy against allowing special needs children to attend the

school, which deprives employees associated with children with disabilities from the same benefits

of employment received by non-disabled children. Ms. McDaniel also stated that she had checked

with other Chevron business units to confirm the policy applied globally.

50.     On October 10, 2022, Plaintiff notified Mr. Voyles via Microsoft Teams chat that he

intended to reach out to Kevin Lyon, a Chevron executive serving as the General Director of TCO, to

"clear the record" on the issues related to enrolling D.P. at DAIS. Mr. Voyles told Plaintiff not to

engage with either Mr. Lyon or Ms. Sumter McDaniel on the issue until they spoke again, and

advised Plaintiff that HR had "dug in even further," with Ms. Sumter McDaniel now falsely accusing

Plaintiff of failing to disclose D.P.'s condition. Plaintiff complained that HR was biased against him

because of his association with his disabled child.

51.     Consistent with the progressive escalations required by STEPS, the appeal was to be

escalated to Mike Williams, the General Counsel for Chevron International. On October 11, 2022,

again via a Microsoft Teams chat, Plaintiff requested to speak with Mr. Voyles and Mr. Williams,

noting once more that he was very troubled by the false allegations HR had spread about Plaintiff failing to disclose needed information, and asking to know the basis for the claims. Mr. Voyles indicated that he wanted to confer with Mr. Williams to get his opinion first.

52.    Plaintiff later learned of an October 12, 2022, meeting organized by Mr. Williams regarding Plaintiff's appeal and attended by Ms. Sumter McDaniel, Dr. Scott Levy, Ms. Ballantyne (the DAIS Director), and Mr. Voyles.  The meeting was designated as legally privileged and confidential.

53.    Having heard nothing on the status of his appeal for multiple weeks, Plaintiff followed up with Mr. Voyles; Mr. Voyles counseled against direct engagement with Mr. Williams about his concerns, saying further inquiries to Mr. Williams would be futile.

54.    On November 8, 2022, approximately six weeks after triggering the STEPS grievance process and after several requests for status updates from Plaintiff, Mr. Lyon called Plaintiff to praise him for a successful audit committee meeting Plaintiff led that morning.  Mr. Lyon then transitioned to talk about Plaintiff's appeal of the schooling decision.  During their call, after acknowledging that Plaintiff's advocacy for his child was "understandable" as a father, Mr. Lyon instructed Plaintiff to cease further escalation of his grievance. He also informed Plaintiff that his assignment was being terminated. Mr. Lyon stated that the decision was made after he consulted with Mr. Williams earlier in the day.  Plaintiff's understanding was that the decision to terminate his assignment early was a consequence of Plaintiff's pursuit of his complaint of associational discrimination.

55.    Mr. Lyon informed Plaintiff that his professional development representative – the same Mr. Williams - would follow up with Plaintiff regarding alternative assignment opportunities with Chevron. Several weeks passed without Mr. Williams's follow-up, so Plaintiff asked for a call. On December 12, 2022, Plaintiff spoke with Mr. Williams, who praised Plaintiff's performance but reiterated that his assignment would be terminated in Summer 2023.

56.    Plaintiff and Mr. Williams discussed which positions may be suitable for his next role, including several other possible international assignments, and Mr. Williams indicated that

Plaintiff would be discussed at an upcoming Legal Professional Development Committee ("PDC")
meeting in January 2023. Throughout the late winter and early spring, Plaintiff repeatedly sought
updates about his next role from his supervisor, Mr. Voyles. In a Microsoft Teams chat exchange on
January 26, 2023, Plaintiff inquired whether Mr. Voyles had any updates from Mr. Williams on his
next assignment. Mr. Voyles responded that Mr. Williams had said nothing, and that he had no idea
what Mr. Williams was thinking on the matter.

57.     Upon information and belief, Mr. Voyles, also frustrated by the lack of urgency from
Mr. Williams in finding a role for Plaintiff, was eventually told by Mr. Williams to "stop asking"
about Plaintiff's next assignment. On February 2, 2023, Plaintiff requested an update from Mr.
Williams on the search for his new assignment via Microsoft Teams chat. Mr. Williams responded
that the need to identify a new assignment for Plaintiff had been raised and would be discussed later
that month.

58.     Plaintiff's successor was identified by February 2023. Upon information and belief,
Plaintiff's successor was not associated with any child with a disability.

59.     In March 2023, Plaintiff approached Chevron's Chief Compliance Officer, David
Cohen, at Chevron Headquarters in San Ramon, California, his dotted-line supervisor, to ask why his
assignment was ended prematurely. Mr. Cohen suggested that Plaintiff ask Mr. Williams. In that
same conversation, Plaintiff also inquired about roles available within Mr. Cohen's organization that
might be suitable for his next assignment. Mr. Cohen identified a junior investigations role that,
when last posted, called for an attorney with 5+ years of experience. Plaintiff has 24 years of
experience.  Mr. Cohen also suggested Plaintiff may be a candidate for Managing Counsel of
Investigations if that position was vacated by the incumbent.

60.     Also in March 2023, Plaintiff spoke with Chevron's Managing Counsel of
Employment Law in his office in San Ramon, California, to express his concerns that Chevron was
disallowing access to the school in Kazakhstan for disabled children of other Chevron employees,
including in one instance rescinding the offered expat assignment altogether.

61.     The Managing Counsel of Investigations position referenced by Mr. Cohen became

vacant in April 2023. On April 17, 2023, Plaintiff reached out again to Mr. Williams via Microsoft Teams to request a status update about the search for his next role, and to specifically ask if he would be considered for the Managing Counsel of Investigations role. Mr. Williams stated that he would call Plaintiff to discuss.

62.     On April 19, 2023, Plaintiff pinged Mr. Williams again via Microsoft Teams chat to ask if Mr. Williams had connected with Mr. Lyons to approve a new rotational arrangement whereby Plaintiff would be allowed to rotate between his assignment in Kazakhstan and his family in the United States. Mr. Williams apologized, indicating that he was in the middle of a tax return project, but assured Plaintiff that he was "on the list" and suggested another call.

63.     On May 24, 2023, Plaintiff reached out again to Mr. Williams via Microsoft Teams chat seeking his permission to apply for the Managing Counsel of Investigations role. Mr. Williams approved the request.

64.     In the 9 months after the time Plaintiff was told his assignment in Kazakhstan would end early, Mr. Williams never identified any roles for Plaintiff, despite Mr. Williams being responsible for Plaintiff's placement and career progression.

65.     On July 7, 2023, Plaintiff had a Teams call with Mr. Williams and Mr. Cohen. They informed him that he was not selected for the position of Managing Counsel of Investigations, and that they were unable to find another role for Plaintiff within Chevron. They told Plaintiff that he would continue receiving a reduced salary through December 2023, but that his employment would end.

66.     Mr. Cohen subsequently confirmed that the decision to terminate Plaintiff's employment was endorsed by Chevron's Vice President and General Counsel, Hewitt Pate, and by Mr. Williams's boss, Andrei Behdjet, in San Ramon.

67.     The decision to terminate Plaintiff was inconsistent with his job performance as documented in his July 25, 2023 TCO Mid-Year Review by Mr. Voyles. Mr. Voyles rated Plaintiff's performance as "exceeds expectation" in three out of four categories, and "valuable contribution" in the fourth.

68.    Plaintiff is the sole breadwinner in his family. After learning he was terminated and concerned for his family's financial stability, Plaintiff asked Chevron if it would be possible to accept the junior investigations role. Mr. Cohen offered a poison pill with the job offer: a condition that Plaintiff not apply to other internal positions for 3-4 years, which would effectively deny Plaintiff the opportunity for any advancement. On information and belief, Chevron does not impose such limitations on any other roles.

69.    Plaintiff repatriated from Kazakhstan on August 13, 2023.

70.    Plaintiff's employment at Chevron was officially terminated on September 7, 2023.

## FIRST CAUSE OF ACTION
### Associational Disability Discrimination in Violation of the ADA

71.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

72.    The ADA provides that no covered entity shall discriminate against a qualified individual by "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(a)-(b)(4).

73.    The ADA also provides that any practice that constitutes discrimination engaged in by a foreign corporation will be imputed to a controlling domestic employer, as determined by the interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control of the employer and foreign corporation. 42 U.S.C. § 12112(c)(2).

74.    A child's relationship with a covered parent is the paradigmatic example of a "relationship" under the association provision of the ADA. 29 C.F.R. § 1630.8.

75.    Autism is defined as a disability under the ADA. 29 C.F.R. § 1630.2 (j)(3)(iii).

76.    At all times relevant herein, Plaintiff was employed by Defendants.

77.    At all times relevant herein, Plaintiff was the father of D.P., who has an ASD diagnosis.

78.    Plaintiff was able to perform the essential job duties for all job positions described herein.

79.     Defendants took several adverse actions against Plaintiff.

80.     Defendants denied Plaintiff equal access to all benefits and privileges of employment when they refused to allow his school-aged child, D.P., to attend the mainstream school provided by the company for children of employees without disabilities. Defendants refused to allow D.P. to attend on the basis of D.P.'s disability, despite endorsements from the school administration and documentation from medical professionals supporting D.P.'s ability to attend without requiring additional staff support.

81.     Defendants discharged Plaintiff from his position as Head of Ethics, Compliance and Internal Investigations in Kazakhstan before it otherwise would have ended.

82.     Defendants refused to hire Plaintiff for any roles comparable to that from which he was discharged.

83.     Defendants refused to consider successive foreign assignments for Plaintiff, as were commonly available to other Chevron employees without disabled children.

84.     Upon Plaintiff's inquiry regarding a junior investigations role with Defendant Chevron, Defendant Chevron placed a unique condition on his potential appointment that Plaintiff not apply to other internal positions for 3-4 years, which would effectively deny Plaintiff the opportunity for any advancement or any new foreign assignments.

85.     Defendants' decision to take these adverse employment actions against Plaintiff was because of Plaintiff's association with D.P., who had a disability.

86.     Defendants' adverse employment actions against Plaintiff were reviewed and ratified by multiple Chevron officers, directors, and managing agents, including senior leaders in Chevron Legal and Human Resources.  Those persons include the General Manager for Human Resources, the Managing Counsel for Employment Law, the General Director of TCO (a Chevron employee), Chevron's Chief Compliance Officer, the General Counsel for Chevron International, and Chevron's Vice President and General Counsel.

87.     As a result of Defendants' actions, Plaintiff has suffered harms and incurred damages and costs recoverable under the ADA, including but not limited to lost wages and benefits, emotional

COMPLAINT AND JURY DEMAND

distress, and attorneys' fees and costs.

88.    Defendants' conduct was a substantial factor in causing Plaintiff's harms.

### SECOND CAUSE OF ACTION
### Retaliation in Violation of the ADA

89.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

90.    The ADA provides that it is unlawful to retaliate against an employee for pursuing his rights under the ADA. 42 U.S.C. § 12203(a).

91.    Plaintiff engaged in protected activity under the ADA when he complained to Defendants that he was being denied a benefit of employment because of his association with a person with a disability and complained about Defendants' application of this discriminatory policy to others.

92.    Defendants took several adverse actions against Plaintiff.

93.    Defendants disparaged Plaintiff by falsely claiming he had obscured or failed to disclose his child's disability through the ordinary medical evaluation process for expatriate assignments.

94.    Defendants discharged Plaintiff from his position as Head of Ethics, Compliance and Internal Investigations in Kazakhstan.

95.    Defendants refused to hire Plaintiff for any roles comparable to that from which he was discharged.

96.    Defendants refused to consider successive foreign assignments for Plaintiff, as were commonly available to other Chevron employees without disabled children.

97.    Upon Plaintiff's inquiry regarding a junior investigations role with Defendant Chevron, Defendant Chevron placed a unique condition on his potential appointment that Plaintiff not apply to other internal positions for 3-4 years, which would effectively deny Plaintiff the opportunity for any advancement or any new foreign assignments.

98.    Defendants' decision to take these adverse employment actions against Plaintiff was because of Plaintiff's complaints regarding associational disability discrimination.

COMPLAINT AND JURY DEMAND

99.    Defendants' adverse employment actions against Plaintiff were reviewed and ratified by multiple Chevron officers, directors, and managing agents, including senior leaders in Chevron Legal and Human Resources.  Those persons include the General Manager for Human Resources, the Managing Counsel for Employment Law, the General Director of TCO (a Chevron employee), Chevron's Chief Compliance Officer, the General Counsel for Chevron International, and Chevron's Vice President and General Counsel.

100.    As a result of Defendants' actions, Plaintiff has suffered harms and incurred damages and costs recoverable under the ADA, including but not limited to lost wages and benefits, emotional distress, and attorneys' fees and costs.

101.    Defendants' conduct was a substantial factor in causing Plaintiff's harms.

### THIRD CAUSE OF ACTION
### Associational Disability Discrimination in Violation of the FEHA

102.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

103.    The FEHA provides that discrimination based on an employee's association with a person who is (or is perceived to be) disabled is an unlawful employment practice. Cal. Gov. Code, § 12926(o).

104.    At all times relevant herein, Plaintiff was an employee of Defendants.

105.    At all times relevant herein, Plaintiff was the father of D.P., who has a disability.

106.    Plaintiff was able to perform the essential job duties for all job positions described herein.

107.    Defendants took several adverse actions against Plaintiff.

108.    Defendants began disparaging Plaintiff by falsely alleging that he had concealed or obscured his child's disability prior to his assignment in Kazakhstan.

109.    Defendants discharged Plaintiff from his position as Head of Ethics, Compliance and Internal Investigations in Kazakhstan.

110.    Defendants refused to hire Plaintiff for any roles comparable to that from which he was discharged.

111.    Defendants refused to consider successive foreign assignments for Plaintiff, as were commonly available to other Chevron employees without disabled children.

112.    Upon Plaintiff's inquiry regarding a junior investigations role with Defendant Chevron, Defendant Chevron placed a unique condition on his potential appointment that Plaintiff not apply to other internal positions for 3-4 years, which would effectively deny Plaintiff the opportunity for any advancement or any new foreign assignments.

113.    Plaintiff's association with his child, who had a disability, was a substantial motivating reason for Defendants' decision to take these adverse employment actions against Plaintiff.

114.    Defendants' adverse employment actions against Plaintiff were reviewed and ratified by multiple Chevron officers, directors, and managing agents, including senior leaders in Chevron Legal and Human Resources.  Those persons include the General Manager for Human Resources, the Managing Counsel for Employment Law, the General Director of TCO (a Chevron employee), Chevron's Chief Compliance Officer, the General Counsel for Chevron International, and Chevron's Vice President and General Counsel.

115.    As a result of Defendants' actions, Plaintiff has suffered harms and incurred damages and costs recoverable under FEHA, including but not limited to lost wages and benefits, emotional distress, and attorneys' fees and costs.

116.    Defendants' conduct was a substantial factor in causing Plaintiff's harms.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of the FEHA

117.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

118.    The FEHA provides that it is unlawful to retaliate against a person "because the person has opposed any practices forbidden under [the FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [the FEHA]." Cal. Gov. Code, § 12940(h).

119.    At all relevant times, Plaintiff was an employee of Defendants.

COMPLAINT AND JURY DEMAND

120.    Plaintiff engaged in protected activity when he complained to Defendants that he was being denied a benefit of employment because of his association with a person with a disability.

121.    Defendants took several adverse actions against Plaintiff.

122.    Defendants discharged Plaintiff from his position as Head of Ethics, Compliance and Internal Investigations in Kazakhstan.

123.    Defendants refused to hire Plaintiff for any roles comparable to that from which he was discharged.

124.    Defendants refused to consider successive foreign assignments for Plaintiff, as were commonly available to other Chevron employees without disabled children.

125.    Upon Plaintiff's inquiry regarding a junior investigations role with Defendant Chevron, Defendant Chevron placed a unique condition on his potential appointment that Plaintiff not apply to other internal positions for 3-4 years, which would effectively deny Plaintiff the opportunity for any advancement or any new foreign assignments.

126.    Plaintiff's complaints regarding associational disability discrimination were a substantial motivating reason for Defendants' decision to take these adverse employment actions against Plaintiff.

127.    Defendants' adverse employment actions against Plaintiff were reviewed and ratified by multiple Chevron officers, directors, and managing agents, including senior leaders in Chevron Legal and Human Resources.  Those persons include the General Manager for Human Resources, the Managing Counsel for Employment Law, the General Director of TCO (a Chevron employee), Chevron's Chief Compliance Officer, the General Counsel for Chevron International, and Chevron's Vice President and General Counsel.

128.    As a result of Defendants' actions, Plaintiff has suffered harms and incurred damages and costs recoverable under FEHA, including but not limited to lost wages and benefits, emotional distress, and attorneys' fees and costs.

129.    Defendants' conduct was a substantial factor in causing Plaintiff's harm.

COMPLAINT AND JURY DEMAND

**FIFTH CAUSE OF ACTION**
**FEHA Failure to Prevent Discrimination and Retaliation**

130.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

131.    The FEHA provides that it is unlawful for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov. Code, § 12940(k).

132.    At all times relevant herein, Plaintiff was employed by Defendants.

133.    Plaintiff was subjected to associational disability discrimination and retaliation in the course of employment, as set forth herein.

134.    Defendants failed to take all reasonable steps to prevent the discrimination and retaliation.

135.    Defendants' adverse employment actions against Plaintiff were reviewed and ratified by multiple Chevron officers, directors, and managing agents, including senior leaders in Chevron Legal and Human Resources.  Those persons include the General Manager for Human Resources, the Managing Counsel for Employment Law, the General Director of TCO (a Chevron employee), Chevron's Chief Compliance Officer, the General Counsel for Chevron International, and Chevron's Vice President and General Counsel.

136.    As a result of Defendants' actions, Plaintiff has suffered harms and incurred damages and costs recoverable under FEHA, including but not limited to lost wages and benefits, emotional distress, and attorneys' fees and costs.

137.    Defendants' conduct was a substantial factor in causing Plaintiff's harm.


**SIXTH CAUSE OF ACTION**
**Whistleblower Retaliation in Violation of the California Labor Code**

138.    Plaintiff repeats and realleges the allegations above as though fully set forth herein.

139.    California Labor Code § 1102.5(b) provides that employers shall not retaliate against employees for disclosing information to a person with authority over the employee or another employee who has the authority to investigate, discovery, or correct legal violations.

140.    At all times relevant herein, Plaintiff was employed by Defendants.

141.    Plaintiff disclosed to employees of Defendants with the authority to investigate, discover, or correct legal violations that Defendants had violated state and federal law by engaging in associational disability discrimination.

142.    Plaintiff had reasonable cause to believe that the information disclosed a violation of state and federal statutes.

143.    Defendants took several adverse actions against Plaintiff.

144.    Defendants discharged Plaintiff from his position as Head of Ethics, Compliance and Internal Investigations in Kazakhstan.

145.    Defendants refused to hire Plaintiff for any roles comparable to that from which he was discharged.

146.    Defendants refused to consider successive foreign assignments for Plaintiff, as were commonly available to other Chevron employees without disabled children.

147.    Upon Plaintiff's inquiry regarding a junior investigations role with Defendant Chevron, Defendant Chevron placed a unique condition on his potential appointment that Plaintiff not apply to other internal positions for 3-4 years, which would effectively deny Plaintiff the opportunity for any advancement or any new foreign assignments.

148.    Plaintiff's disclosures regarding Defendant's unlawful activity were a substantial motivating reason for Defendants' decision to take these adverse employment actions against Plaintiff.

149.    Defendants' adverse employment actions against Plaintiff were reviewed and ratified by multiple Chevron officers, directors, and managing agents, including senior leaders in Chevron Legal and Human Resources.  Those persons include the General Manager for Human Resources, the Managing Counsel for Employment Law, the General Director of TCO (a Chevron employee), Chevron's Chief Compliance Officer, the General Counsel for Chevron International, and Chevron's Vice President and General Counsel.

150.    As a result of Defendants' actions, Plaintiff has suffered harms and incurred damages

and costs recoverable under the Labor Code, including but not limited to lost wages and benefits, emotional distress, and attorneys' fees and costs.

151.    Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## **PRAYER FOR RELIEF**

Plaintiff seeks judgment against Defendant awarding Plaintiff the following forms of relief:

1.  A declaratory judgment that Defendant knowingly and intentionally violated the certain provisions of the ADA and FEHA;
2.  Compensatory damages according to proof;
3.  Punitive damages;
4.  Statutory damages, liquidated damages, and penalties according to proof;
5.  Pre-judgment interest on all sums awarded;
6.  Reasonable attorneys' fees and costs pursuant to applicable law;
7.  Costs of suit herein; and
8.  For such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury for each and every cause of action so triable.

Dated: May 29, 2025

*/s/ Bryan Schwartz*
Bryan Schwartz (SBN 209903)
Erica Posey (SBN 356109)
BRYAN SCHWARTZ LAW, P.C.
180 Grand Avenue, Suite 1380
Oakland, CA 94612
Tel. (510) 444-9300
Fax (510) 444-9301
Email: bryan@bryanschwartzlaw.com
        erica@bryanschwartzlaw.com

*Attorneys for Plaintiff*